UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| BREY C. RASCO, et al., | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiffs, | ) |  |
|  | ) |  |
| v. | ) | No.: 3:22-CV-149-KAC-JEM |
|  | ) |  |
| BTI TOOLS, LLC, et al., | ) |  |
|  | ) |  |
| Defendants. | ) |  |

**MEMORANDUM OPINION AND ORDER
DENYING MOTION FOR SUMMARY JUDGMENT**

This Tennessee products liability action is before the Court on a "Motion for Summary Judgment" [Doc. 48] filed by Defendants BTI Tools, LLC; AOB Products Company, d/b/a Battenfield Technologies, Inc.; and American Outdoor Brands, Inc. Because genuine disputes of material fact exist, the Court denies the Motion.

**I.      Background**[1]

It appears that Defendants manufacture the SCAXE10 hatchet and distribute it to stores for resale [*See* Doc. 55-4 at 3-4 (Deposition of Brent Vulgamott ("Vulgamott Dep.") 14:7-27:9)]. During the time relevant to this litigation, the hatchet arrived for resale in sealed clamshell packaging, a plastic mold that is difficult to open [Doc. 55-1 at 2 (Deposition of Randy Lee Phares ("Phares Dep.") 11:9-20)]. The hatchet contained no opening instructions, and the hatchet blade was uncovered within the clamshell packaging [*Id.* (Phares Dep. 11:12-14); *see also id.* at 52 (Expert Witness Report of Randy Phares "Phares Report"))].

---

[1] The Court views the facts in the light most favorable to Plaintiffs Brey C. Rasco and Twyla Rasco, the nonmoving Parties, and makes all reasonable inferences that can be drawn from those facts in their favor. *See Matsushita Elec. Indus., Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Plaintiff Brey C. Rasco ("Mr. Rasco") purchased a SCAXE10 hatchet from a Rural King store in Knoxville, Tennessee before holding a cookout with friends [Doc. 55-3 at 6-7 (Deposition of Brey Rasco ("B. Rasco Dep.")) 47:14-48:9)]. At some point before his guests arrived, Mr. Rasco "was on the porch opening" the hatchet [*Id.* at 8 (B. Rasco Dep. 58:6-13)]. Mr. Rasco "laid [the packaged hatchet] down on the table," "took [his] knife out," and "cut the edge" of the packaging, "trac[ing] the tang, up the side of the tang, . . . around to the front of the blade, around the top, and down the backside" [*Id.* at 8-10 (B. Rasco Dep. 58:18-60:2)]. While Mr. Rasco was cutting the hatchet out of the clamshell packaging, his cookout guests arrived and Mr. Rasco stopped cutting the packaging open [*Id.* at 8-9, 11 (B. Rasco Dep. 58:6-9, 58:21-59:1, 61:1-7)]. Mr. Rasco did not "completely" cut the hatchet out of the clamshell packaging before he set the hatchet down and went inside with his guests [*Id.* at 10-11 (B. Rasco Dep. 60:3-61:7)].

Sometime later, Mr. Rasco and his guests "decided to go out and start cutting firewood to start [a] fire" [*Id.* at 11 (B. Rasco Dep. 61:8-10)]. Mr. Rasco retrieved the packaged hatchet and began "pulling [the] hatchet out of the package" [*Id.* (B. Rasco Dep. 61:19-25)]. Then, the hatchet "hit [Mr. Rasco] in the arm" [*Id.* at 12 (B. Rasco Dep. 62:1-2)]. Mr. Rasco "immediately grabbed [his] arm and spun around to everybody" and said "'call an ambulance. Call an ambulance now. I'm bleeding'" [*Id.* at 13 (B. Rasco Dep. 63:15-22)].

Mr. Rasco sustained a deep wound, exposing his bone [Doc. 55-7 at 2 (Deposition of Jesse Frye ("Frye Dep.") 21:5-6)]. Cookout guest "Jesse [Frye] applied pressure and made a tourniquet out of his belt to try to stop the bleeding" [Doc. 55-3 at 14 (B. Rasco Dep. 65:11-15)]. Eventually, "a helicopter landed in [Mr. Rasco's] field to take [him] to the ER" [*Id.*].

Plaintiff's expert witness testified that for items contained in sealed clamshell packaging, it is "generally accepted industry standard[]" that a company "design[s] the package so it can safely

2

hold the product for shipping, for display in the retail location, and for opening by the clients, or by the customer" [Doc. 55-1 at 10 (Phares Dep. 61:3-9)]. If the hatchet package "cannot be opened safely without specific processes," it is generally accepted industry standard for a manufacturer to "put some type of labeling on [the package] to notify" "the consumer that there is a danger" [*Id.* (Phares Dep. 61:10-19)]. "[M]anufacturers" and "marketing groups" understand "generally accepted industry standards" that involve the need to provide instructions on how to open products when the packaging can be difficult for a consumer to open [*See id.* at 11 (Phares Dep. 62:6-22)]. Without opening instructions, "it's foreseeable that consumers would attempt to open" a hatchet "in a variety of different ways" [Doc. 55-2 at 5 (Deposition of Steve Hall ("Hall Dep.") 21:5-10)].

Jesse Frye testified that he would expect some form of additional covering on the hatchet blade inside the sealed clamshell packaging [Doc. 55-7 at 3, 5-6 (Frye Dep. 25:10-16, 35:2-17, 37:11-14)]. Indeed, "[e]very time [he's] ever seen a blade being sold that is opened, it's got a cover on it, a safety cover" and "[a]nytime you go and get a hatchet from Ace Hardware, [he's] always seen wax on the blades" [*Id.* at 3-4 (Frye Dep. 25:10-26:9)]. Plaintiffs further proffered expert testimony suggesting that Defendants' packaging fell below minimum consumer expectations for safety [*See* Doc. 55-1 at 15 (Phares Dep. 94:2-10)].

Other manufacturers have placed protective coverings over similar hatchet blades, irrespective of whether the hatchet is sold in plastic packaging [*See* Doc. 55-4 at 6-18 (Vulgamott Dep. Exhibits)]. In fact, Defendants manufacture and package a hatchet, the "Hooyman," with a protective blade covering [*See id.* at 6 (Vulgamott Dep. Exhibit)]. There is more known risk when removing "an unguarded blade edge" from a clamshell packaging than removing a hatchet with a covered blade [*See* Doc. 55-2 at 7 (Hall Dep. 29:10-13)]. "[C]overing the sharp part" of the hatchet

3

Case 3:22-cv-00149-KAC-JEM   Document 78   Filed 09/17/24   Page 3 of 11   PageID #: 792

may "prevent some cuts" [*Id.* at 9-10 (Hall Dep. 48:19-49:2)].  Had Defendants placed "plastic or rubber" "on the [hatchet] blade," "the incident . . . would have been less likely to have cut" Mr. Rasco [Doc. 55-1 at 13 (Phares Dep. 85:16-18)].

On March 22, 2022, Mr. Rasco and his wife, Plaintiff Twyla Rasco, filed a complaint in the Circuit Court for Sevier County, Tennessee, asserting products liability claims against multiple Defendants [Doc. 1-2]. Defendant BTI Tools, LLC removed the action to this Court [*See* Docs. 1, 7, 8, 9]. Plaintiffs subsequently dismissed their claims against various Defendants [*See* Docs. 16, 44]. The remaining Defendants—BTI Tools, LLC; AOB Products Company, d/b/a Battenfield Technologies, Inc.; and American Outdoor Brands, Inc.— filed the instant Motion, asserting that they are entitled to judgment as a matter of law as to all claims [Doc. 48]. Plaintiffs responded [Doc. 55] and Defendants replied [Doc. 58].

II.     **Legal Standard**

Under Federal Rule of Civil Procedure 56, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the facts in the light most favorable to the nonmoving parties and make all reasonable inferences that can be drawn from those facts. *See Matsushita*, 475 U.S. at 587. The Court must "not weigh the evidence or make credibility determinations." *See Smith v. City of Toledo*, 13 F.4th 508, 514 (6th Cir. 2021). A moving party bears the burden of demonstrating that no genuine dispute as to any material fact exists. *See Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 323 (6th Cir. 2023) (citing *Scott v. First S. Nat'l Bank*, 936 F.3d 509, 516 (6th Cir. 2019)). "A genuine issue of material fact exists when there are disputes over facts that might affect the outcome of the suit under the governing law." *See Regions Bank v. Fletcher*, 67 F.4th 797, 802 (6th Cir. 2023) (citation and quotation omitted).

### III. Analysis

The Tennessee Products Liability Act, Tenn. Code Ann. § 29-28-101, *et seq.* ("TPLA"), "superseded common law claims for personal injuries stemming from alleged defects in products." *See Coffman v. Armstrong Int'l, Inc.*, 615 S.W.3d 888, 895 (Tenn. 2021). Under the TPLA, "establishing a prima facie products-liability claim requires" a plaintiff to show that: (1) "the product was defective and/or unreasonably dangerous," (2) "the defect existed at the time the product left the manufacturer's control, and" (3) "the plaintiff's injury was proximately caused by the defective product." *See Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008) (citation omitted). Defendants do not contest the second element.[2]

As to the first element of the prima facie case, the "general rule in Tennessee is that the issue of whether a product is defective or unreasonably dangerous is one for the jury." *Id.* at 484 (citing *Jackson v. Gen. Motors Corp.*, 60 S.W.3d 800, 805 (Tenn. 2001)). Tennessee courts "favor[] a disjunctive interpretation of" the TPLA, so a plaintiff may make his case by establishing "either that the product was defective or unreasonably dangerous," or both. *See, e.g.*, *Fulton v. Pfizer Hosp. Prods. Grp., Inc.*, 872 S.W.2d 908, 911 n.1 (Tenn. Ct. App. 1993).

"[A] product is deemed defective when it is in a condition 'that renders it unsafe for normal or anticipatable handling and consumption.'" *See Strayhorn v. Wyeth Pharma, Inc.*, 737 F.3d 378, 392 (6th Cir. 2013) (quoting Tenn. Code Ann. § 29-28-102(2)). Plaintiff must identify evidence of a "specific defect." *See Hill v. Kia Motors Am., Inc.*, Nos. 20-5690/5693, 2022 WL 557823, at *8 (6th Cir. Feb. 24, 2022) (citation omitted). In assessing whether a product was defective, the Court looks to "the state of scientific and technological knowledge available to the manufacturer

---

[2] And no Defendant challenges whether it is a "manufacturer" within the text of the TPLA [*See* Docs. 48, 58]. *See also* Tenn. Code. Ann. 29-28-102(4) (defining "manufacturer").

5

or seller at the time the product was placed on the market." *See* Tenn. Code Ann. § 29-28-105(b). "Consideration is given also to the customary designs, methods, standards and techniques of manufacturing, inspecting and testing by other manufacturers or sellers of similar products." *Id.* "[E]vidence of a technologically feasible and practical alternative design that likely would have reduced or prevented plaintiff's harm," is "highly relevant and probative" in assessing "whether a product was defective" under the TPLA. *See Potter v. Ford Motor Co.*, 213 S.W.3d 264, 269 (Tenn Ct. App. 2006) (citing *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 278 (Tenn. 2005)). "[E]xpert testimony is not the only way to prove a claim that a consumer product" is defective under the TPLA. *See Bradley v. Ameristep, Inc.*, 800 F.3d 205, 210 (6th Cir. 2015).

Here, Plaintiffs identified three specific defects in the relevant hatchet packaging: that (1) the sealed clamshell packaging was difficult to open; (2) the hatchet had no protection on the blade while in the sealed clamshell packaging; and (3) the packaging contained no instructions on how to open it safely [*See* Doc. 55-1 at 2, 6, 10, 13]. And Plaintiffs provide evidence of "customary designs" "by other manufacturers or sellers of similar products" that cover the blade in and out of plastic packaging and do not use heat-sealed clamshell packaging [*See id.* at 52 ("There were many packaging options that could have been utilized"); *see also* Doc. 55-4 at 6-18]. Plaintiffs identified further evidence of "technological knowledge available to" Defendants "at the time the product was placed on the market" that supports their claim that the hatchet, as packaged, was defective [*See* Doc. 55-4 at 6-18; *see also* Doc. 55-1 at 13 (Phares Dep. 85:16-18) ("If plastic or rubber had been put on the blade . . . the incident . . . would have been less likely to have cut [Plaintiff]")]. *See* Tenn. Code Ann. § 29-28-105(b). Indeed, there is evidence that Defendants sell a hatchet with a covering on the blade [*See* Doc. 55-1 at 52 (Phares Report); *see also* Doc. 55-4 at 3, 6 (Vulgamott Dep. 17:1-7)].

Plaintiffs' proffered evidence of these "technologically feasible and practical alternative design[s]," [*see* Doc. 55-4 at 6-18], is "highly relevant and probative" of whether the hatchet packaging at issue here was defective, *see Potter*, 213 S.W.3d at 269 (citation omitted). And this evidence raises a genuine dispute of material fact regarding whether Defendants' hatchet packaging was defective. Indeed, the "general rule in Tennessee is that the issue of whether a product is defective" is "one for the jury." *See Sigler*, 532 F.3d at 484; *see also Jackson*, 60 S.W.3d at 805-06. And that rule holds true here.

Alternatively, to establish that a product is unreasonably dangerous, "Tennessee law provides two tests:" the (1) consumer expectation test and (2) prudent manufacturer test. *Sigler*, 532 F.3d at 483-84. But these two tests "are not mutually exclusive." *Strayhorn*, 737 F.3d at 392. Here too, "evidence of a technologically feasible and practical alternative design that likely would have reduced or prevented plaintiff's harm" is "highly relevant and probative" to determining whether a product is "unreasonably dangerous." *See Potter*, 213 S.W.3d at 269 (citation omitted).

The consumer expectation test "simply requires a showing that the product's performance was below reasonable minimum safety expectations of the ordinary consumer having ordinary, 'common' knowledge as to its characteristics." *See Sigler*, 532 F.3d at 483-84 (citing *Jackson*, 60 S.W.3d at 806). A plaintiff must "produce evidence of the objective conditions of the product as to which the jury is to employ its own sense of whether the product meets ordinary expectations as to its safety under the circumstances." *See Bradley*, 800 F.3d at 210-11.

The prudent manufacturer test, by contrast, "requires proof about the reasonableness of the manufacturer or seller's decision to market a product assuming knowledge of its dangerous condition." *See Strayhorn*, 737 F.3d at 392 (citation omitted). "[E]xpert testimony about" prudent

manufacturing decisions is "essential." *See Sigler*, 532 F.3d at 484 n.7. Applying the prudent manufacturer test "involves a risk-utility analysis." *See Privette v. CSX Transp., Inc.*, 79 F. App'x 879, 889 (6th Cir. 2003) (citing *Ray v. BIC Corp.*, 925 S.W.2d 527, 530 (Tenn. 1996)). The Court assesses factors such as a product's "usefulness and desirability," "safety aspects," "availability of a substitute product which would meet the same need," a "manufacturer's ability to eliminate the unsafe character, the user's ability to avoid danger, the user's awareness of the danger, and the feasibility of spreading the loss." *Id.* (same).

Plaintiffs have raised a genuine issue of material fact as to whether Defendants' packaging fell "below reasonable minimum safety expectations of the ordinary consumer." *See Sigler*, 532 F.3d at 483-84 (citing *Jackson*, 60 S.W.3d at 806). Plaintiffs introduced testimony demonstrating that a triable issue of fact exists as to whether an ordinary consumer would expect some additional protective covering on a sealed clamshell packaged hatchet blade [Doc. 55-7 at 3, 5-6 (Frye Dep. 25:10-16, 35:2-17, 37:11-14)]. Indeed, Frye testified that "[e]very time [he's] ever seen a blade being sold that is opened, it's got a cover on it, a safety cover" and that "[a]nytime you go and get a hatchet from Ace Hardware, [he's] always seen wax on the blades" [*Id.* at 3-4 (Frye Dep. 25:10-26:9)]. And Plaintiffs proffered expert testimony suggesting that Defendants' packaging fell below the minimum safety expectations of the ordinary consumer [*See* Doc. 55-1 at 15 (Phares Dep. 94:2-10)].

Under the prudent manufacturer test, the result is the same—Plaintiffs raise a triable issue of material fact as to whether a prudent manufacturer, assuming its knowledge of the hatchet's dangerous condition, would package the hatchet in the way Defendants did. As an initial matter, Plaintiffs proffer admissible expert testimony that "manufacturers" and "marketing groups" understand "generally accepted industry standards" involving the need to provide instructions

8

regarding how to open products when the packaging could be difficult for a consumer to open [*See id.* at 11 (Phares Dep. 62:6-22)]. And as with demonstrating product defect, Plaintiffs evidence of alternative designs further demonstrates that a triable issue of fact exists as to whether the hatchet packaging is unreasonably dangerous. *See Potter*, 213 S.W.3d at 269 (citation omitted).

Analyzing the factors under the prudent manufacturer test, it is unclear whether usefulness and desirability favor Plaintiffs or Defendants. Defendants maintain that the current packaging of the hatchet involved in Mr. Rasco's injury is necessary to protect it during delivery and shipment as well as ensure safety for the consuming public in retail environments [Doc. 58 at 4-5]. The availability of substitute products that can meet Defendants' needs appears to weigh in favor of Plaintiffs. Defendants already utilize one of the alternative designs Plaintiffs posit for one of Defendants' own hatchets. On this record, it is unclear who the final factor supports. Defendants could minimize the danger by adding a blade cover and instructions on how to open sealed clamshell packaging. But a user could conceivably take additional steps and exercise further care to avoid the dangers of a known sharp product that befell Mr. Rasco. And it is unclear how feasible spreading the loss is. Resolution of these questions is appropriately left to the jury.

As to the third element of the prima facie case, in any "[p]roduct[s] liability action," the TPLA requires a plaintiff's injury to be "caused by or result[] from" a product's "manufacture," "design," or "warning." *See* Tenn. Code. Ann. § 29-28-102(6). A plaintiff must generally "show that the product manufactured and sold by the defendant caused the injuries he alleges." *See Strayhorn*, 737 F.3d at 404 (quotation marks omitted). Tennessee provides a "three-pronged test for proximate cause:" (1) a defendant's conduct "must have been a 'substantial factor' in bringing about the harm complained of;" (2) "there is no rule of policy that should relieve a

9

wrongdoer;" and (3) "the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence." *See Jackson v. Ford Motor Co.*, 842 F.3d 902, 908 (6th Cir. 2016) (citing *Haynes v. Hamilton Cnty.*, 883 S.W.2d 606, 611-12 (Tenn. 1994)). Proximate cause is "ordinarily [a] jury question[], unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome." *See id.* (quoting *Haynes*, 883 S.W.2d at 612).

Here too, a genuine dispute of material fact exits. Plaintiffs identified three alleged defects in the hatchet packaging. The hatchet hit Mr. Rasco "in the arm," leading to his injury, when he began "pulling the hatchet out of the package" [Doc. 55-3 at 11-12 (B. Rasco Dep. 61:19-62:2)]. Plaintiffs' expert testified that if Defendants placed "plastic or rubber" "on the [hatchet] blade," "the incident . . . would have been less likely to have cut" Mr. Rasco [Doc. 55-1 at 13 (Phares Dep. 85:16-18)]. This evidence would permit a jury to conclude that an alleged defect in the hatchet packaging was a "substantial factor" in Mr. Rasco's injury. *See Jackson*, 842 F.3d at 908. No Party identified any rule or public policy in Tennessee that would absolve Defendants of liability in this circumstance. And Plaintiffs have introduced some evidence that Defendants could have foreseen or anticipated that a consumer "would attempt to open" the hatchet "in a variety of different ways," given the lack of opening instructions [Doc. 55-2 at 5 (Hall Dep. 21:5-10)].

At bottom, "the facts and inferences" do not, "make it so clear" that Defendants are entitled to judgment as a matter of law. *See Jackson*, 842 F.3d at 908 (citation omitted). Defendants argue that Mr. Rasco's "inability to recall specific details concerning" how he removed the hatchet from the packaging "undermines his ability to provide reliable testimony concerning his use, handling, and/or operation of the hatchet" [Doc. 49 at 8]. But Mr. Rasco testified to certain limited facts that

10

he could remember, and the Court does not make "credibility determinations" at summary judgment. *See Smith*, 13 F.4th at 514.

## IV. Conclusion

Accordingly, the Court **DENIES** Defendants' "Motion for Summary Judgment" [Doc. 48].

SO ORDERED.

_____
KATHERINE A. CRYTZER
United States District Judge

11

Case 3:22-cv-00149-KAC-JEM   Document 78   Filed 09/17/24   Page 11 of 11   PageID #: 800